**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

TRAVIS PAUL PERRY,                                    **Case No. 0:25-cv-03352-LMP-LIB**

  Plaintiff,                                              **DECLARATION OF TRAVIS PERRY IN**

                                                   **SUPPORT OF RULE 59(e) MOTION AND**

v.                                                    **MOTION FOR LEAVE TO FILE SECOND**

                                                   **AMENDED COMPLAINT**

CITY OF WATERVILLE, MINNESOTA;

WATERVILLE PLANNING AND ZONING

COMMISSION; JASON MORAN, in his

official and individual capacities; and TERESA

HILL, in her official and individual capacities,

  Defendants.

1. I am the Plaintiff in this action. I am over 18 years old, competent to testify, and make this declaration based on my personal knowledge unless otherwise stated. When I refer to City records, OCM emails, filed papers, or exhibits, I identify them based on my personal receipt, submission, review, or the City's production of those records.

2. I make this declaration under 28 U.S.C. § 1746 in support of my motion to alter or amend judgment under Rule 59(e) and my request for leave to file the proposed Second Amended Complaint.

3. I reside at and co-own the property at 529 N. Mallory Street, Waterville, Minnesota. My father is also a co-owner. My father knew about and supported my plan to use the property for the proposed microbusiness.

4. I am a United States Army veteran. I am also a Stage IV thyroid-cancer survivor. I no longer have a thyroid and have significant medical problems, including chronic pain and non-epileptic seizures that can be worsened or triggered by stress and emotional overload.

5. Because of my medical problems, I have not been able to maintain ordinary employment. The proposed business was not a hobby, casual idea, or last-minute plan. It was intended to be a realistic way for me to earn income despite disability and to build something meaningful from my property, my cancer-survivor experience, and my veteran/social-equity status.

6. I formed Snoeeons Nurturing Buds and Resources LLC in connection with the Minnesota cannabis licensing process. I am the sole member, 100% owner, and sole decision-maker. I am not trying to represent Snoeeons Nurturing Buds and Resources LLC as a separate plaintiff. I seek relief for injuries to me personally, including interference with my property-use opportunity, process rights, veteran/social-equity licensing opportunity, business-launch opportunity, and economic opportunity uniquely tied to me as the qualifying applicant.

7. I began seriously planning the cannabis microbusiness and related charitable mission around 2022, after surviving cancer and entering remission. I wanted the business to support me and my family and eventually help disabled veterans, cancer survivors, and people with serious medical conditions build better lives and businesses.

8. My proposed Year-One plan was to start small from my attached garage at my residential property. Starting at home was the realistic path because I did not have the capital, operating history, or health capacity to begin by leasing or buying a commercial or industrial building.

9. The purpose of the Year-One home-garage launch was to create revenue, operating history, and proof of concept before trying to obtain financing or expand into a larger commercial or industrial location.

10. The Year-One plan focused on cultivation and seed production. I also wanted, if lawful and approved, to produce cannabis butter or use a heat press/rosin process. I did not intend to use butane, CO2, ethanol, or solvent extraction at my home.

11. My plan did not include walk-in retail customers at my home. I told the City that I did not want people coming to my house for purchases. My intended sales were wholesale, online if lawful, or to licensed dispensaries and other licensed businesses.

12. I planned odor-control, security, locks, doors, carbon filters, and other safeguards. I was willing to comply with reasonable conditions, inspections, security requirements, odor requirements, and any lawful requirements from the City or OCM.

13. I use organic methods in cultivation. My plan involved organic soils, organic inputs, worm composting and worm castings, reuse of plant material, and avoiding synthetic chemical pesticides. I was not proposing a hazardous chemical operation.

14. I have been an organic gardener for more than twenty years. My planned cannabis microbusiness was not a passive investment or a business opportunity that could simply be separated from my own background, labor, and skills. It depended on my personal experience making soil, using organic nutrients and methods, growing plants, breeding strains, creating seeds, and developing cultivation practices.

15. I also have broad hands-on skills that were important to the planned business. In addition to organic gardening, I have experience with construction, concrete work, metal work, welding, horticulture, agriculture, soil science, mycology, plant cultivation, irrigation or closed watering

systems, lighting, filtration, and facility buildout. I expected to do or directly manage nearly every core part of the Year-One garage buildout and operation myself, with limited help only for extra hands because of the physical strain caused by my medical conditions.

16. I previously worked professionally in mold remediation. In that field, I worked with identifying, cleaning, and remediating mold and with issues involving fire damage, water damage, dampness, moisture, and related environmental problems. Those skills were directly relevant to cannabis cultivation because the Year-One garage launch required moisture control, mold prevention, air quality, filtration, sanitation, water management, and environmental control.

17. I had personally bred or developed approximately four cannabis strains and intended to use, sell, or supply genetics, seeds, and clones from strains I created. Those genetics and seed opportunities were tied to my own cultivation, breeding, and seed-creation work.

18. My Year-One residential garage plan was different from my later expansion plan. At the residence, the Year-One plan was limited to cultivation, seed production, genetics development, clones, and simple non-solvent processing such as heat-press/rosin processes and cannabis butter. After generating operating history and relocating to a properly zoned commercial or

industrial location, I intended to expand into broader lawful cannabis products allowed by state licensing and local zoning, including products such as RSO oil. I did not plan chemical or solvent extraction at the residential garage.

19. I understood that OCM would not allow business operations to pass through a dwelling. For the attached garage, I planned to remove, seal, wall off, or otherwise separate the interior connection between the garage and the living area as needed so the business area could be accessed without passing through a dwelling.

20. I understood that OCM preliminary approval was not a final license and did not authorize operations. I also understood OCM would require final plans, local zoning compliance, inspection, payment of final fees, and a final license before any business could operate.

21. OCM communications before and during the local process confirmed my understanding that local zoning compliance was handled through the local unit of government. In OCM communications that I received, OCM explained that it verifies local zoning compliance as a licensing step but does not mandate what the local zoning requirements are. OCM directed applicants to contact the local unit of government where the business would be located. Those OCM communications are included in Exhibit 0071.

22. I did not receive any OCM communication telling me that my attached garage was automatically barred as a possible cannabis microbusiness location regardless of local zoning. My understanding was that final approval would depend on final plans, local compliance certification, and OCM review.

23. Before January 13, 2025, in early January 2025, I went to the old City Hall and spoke with Teresa Hill near the front lobby area. I went there because I wanted to know exactly what local process I needed to follow to start the business lawfully.

24. During that conversation, I told Hill I was a Stage IV thyroid-cancer survivor, had no thyroid, was a United States Army veteran, and was trying to start a lawful cannabis microbusiness because I could not maintain ordinary employment and needed a way to earn income.

25. I told Hill that my veteran status was the reason I qualified for social equity under Minnesota's cannabis program. I asked what I needed to do locally so that, when the State issued licenses or moved the process forward, I could comply with local requirements.

26. Hill did not give me a conditional-use-permit form. She did not tell me to file a CUP application. She did not identify the Zoning Administrator. She did not mention a fee. She did not request a site plan. She did not tell me about City Code Section 150.19. She did not explain that I needed to submit written and graphic materials through a formal CUP process.

27. Instead, Hill told me in substance that it should go to the City Council first. I relied on that instruction because she was the City Administrator-Clerk and the City person I went to for process guidance.

28. On or about January 13, 2025, I submitted written materials to the City because Hill had routed me to the Council. Those materials were meant to ask the City for a lawful path. They were not drafted as a final technical CUP application because nobody had given me a CUP form, told me I had to file one, identified the Zoning Administrator, or explained the formal CUP materials that the City later claimed were missing.

29. My January 13 materials were broader than the narrower Year-One plan I later tried to explain. I was attempting to explain the microbusiness license concept and possible activities, not to submit final building, fire, OCM, or zoning plans. The January 13 materials are reflected in Exhibits 0020 and 0021.

30. If any City official had told me that a formal CUP application, fee, site map, written and graphic materials, or Zoning Administrator submission was required, I would have tried to follow that instruction. The City never gave me that instruction before routing the matter through Council and Planning and Zoning.

31. I had additional business and operational details beyond what was submitted on January 13, including more details about odor control, security, customer traffic, garage separation,

cultivation methods, and non-solvent processing. Those details were never requested from me through a formal CUP or site-review process before the City moved against the residential path.

32. On January 21 or 22, 2025, City communications placed my request on the City Council path. I later obtained City Attorney Jason Moran's January 22, 2025 email from City records. I did not receive that email at the time it was sent because it was a communication from Moran to the City. In that email, Moran stated that if I wanted to go forward, I would need to appear before the Council first, and if the Council was inclined to entertain it, the Council would send it to Planning and Zoning. He also raised odors, crime, delivery traffic, manufacturing, precedent, and stated that it would be a good time to tighten up the home-occupation ordinance. That email is Exhibit 0023.

33. On February 4, 2025, the City Council agenda identified my request as a home-based cannabis microbusiness amendment request. I appeared and tried to explain that I wanted a lawful way to start small from my property, with no ordinary retail storefront and no customer traffic at my house. The February 4 agenda and related materials are reflected in Exhibits 0025 through 0030.

34. After the February 4 meeting, the matter was referred to Planning and Zoning. At no time after the February 4 meeting did Hill, Moran, any Council member, any Planning and Zoning member, or any other City official give me a CUP form or tell me that I needed to file a formal CUP application under Section 150.19.

35. On February 13, 2025, Hill emailed me that I was on the Planning Commission agenda for February 19 and that I would want to be present to discuss my requested ordinance amendment. Hill also stated that she would furnish the documentation I left with her at the Council meeting. That email is Exhibit 0031. That email did not tell me to file a CUP application.

36. On February 19, 2025, Planning and Zoning discussed my request. The minutes state that I sought to allow a small home-based micro cannabis business in a residential area with a conditional permit, without direct sales from the home, and that I would sell to a medical dispensary or licensed dispensary or shop. The February 19 minutes are Exhibits 0032 and 0033.

37. The February 19 minutes also state that Hill said OCM verifies whether the City is zoned for the production and that Hill wanted to clarify that I was requesting a permitted use and not a conditional use permit. The minutes then discuss CUP-related issues, including that an approved CUP stays with the property and may be lost if not used. The matter was tabled until more information was available from Moran. Those facts are reflected in Exhibits 0032 and 0033.

38. I understood the February 19 discussion as confirmation that the City was controlling the local route through ordinance/home-occupation/zoning discussions. I did not understand that I had secretly failed to complete a separate formal CUP process that no City official had ever given me.

39. In March 2025, Hill and Moran exchanged emails showing that Moran would attend the March 17 Planning and Zoning meeting because the City was also dealing with the marijuana microbusiness issue. Those emails are reflected in Exhibits 0034 through 0038.

40. On March 17, 2025, Planning and Zoning again discussed my request. Moran attended and spoke. The official March 17 minutes are Exhibits 0039 and 0040.

41. The March 17 official minutes state that my request involved a home-based micro cannabis business in a residential district and that Moran said it could be a risk, could set precedent for manufacturing in a residential area, and could open the door for others wanting to do the same. The minutes list concerns including smell, noise, traffic, water, crime, knowing what was growing inside the house, and garage security issues. Those facts are reflected in Exhibit 0039.

42. The March 17 official minutes state that Moran said he could do a CUP with reasonable conditions and that a CUP could be revoked for violations, but that revocation could be a long process. The minutes further state that Moran worried it could open up people wanting to make gun powder or fireworks in residential areas. Those facts are reflected in Exhibit 0040.

43. The March 17 official minutes state: "Can the council make it a conditional use permit? Moran said yes but should they, no." The minutes then state that a motion was made to deny the request of changing the zoning and not to allow it as a use as a conditional use permit, and that the motion carried 3-0. That is reflected in Exhibit 0040.

44. The City later produced the March 17 audio to me in response to my data request. On May 5, 2025, the City confirmed that the February 19 and March 17 audio was ready for me to pick up. That City confirmation is Exhibit 0044.

45. I prepared a corrected transcript from the City-produced March 17 audio. That corrected transcript is Exhibit 0069.

46. The corrected transcript is accurate to the best of my knowledge and ability. I did not alter the audio. Where I could not identify a speaker with certainty, I identified the speaker to the best of my ability based on the recording and official meeting records.

47. The docket reflects that I previously filed Exhibit 0069 and that portable media/audio related to the March 17 recording was conventionally filed with the Clerk's Office.

48. At the March 17 meeting, Moran described my request as involving manufacture and retail sales in residential zones, and I clarified cultivation and that my manufacturing would be butter or heat press. Ex. 0069, lines 24-35.

49. At the March 17 meeting, I explained that I did not want people coming to my house for purchases and that sales would be online, per harvest, through dispensaries, or through lawful channels. Ex. 0069, lines 73-88.

50. At the March 17 meeting, a Commission member acknowledged in substance that I might run the cleanest and best possible operation but expressed concern about future applicants. Ex. 0069, lines 103-108.

51. At the March 17 meeting, I tried to focus the discussion on cultivation because that was the main concern for the Year-One plan. Ex. 0069, lines 114-126.

52. At the March 17 meeting, Moran discussed that the Council could make a use conditional, impose conditions, revoke a CUP for violations, hold a hearing, make findings, and create an appeal path. Ex. 0069, lines 142-154.

53. At the March 17 meeting, I asked whether the City could change the use to a conditional use. Moran answered in substance that legally the City could, but then argued that it should not. Ex. 0069, lines 169-179.

54. At the March 17 meeting, a motion was made and carried using language that I understood as denying the requested zoning change and not allowing the use as a conditional use permit. Ex. 0069, lines 183-199.

55. I do not claim in this declaration that the March 17 vote was a formal final CUP adjudication by the City Council. I claim that the City-directed process objectively communicated to me that the residential conditional-use path would not be allowed before any City official had ever given me the formal CUP process.

56. After March 17, no City official told me that I could still file a CUP application, that I should file a CUP application, or that the CUP path remained open for my proposed residential cannabis microbusiness.

57. Specifically, at no time after March 17, 2025 did Hill, Moran, any Council member, any Planning and Zoning member, or any other City official tell me that I could still file a CUP application, that I should file a CUP application, or that the CUP path remained open for my proposed residential cannabis microbusiness.

58. After March 17, I was medically and emotionally affected by what happened. I felt like the City had taken away the only realistic first step I had to start the business. My stress, depression, and seizure issues worsened. My persistence in continuing to petition the City does not mean I was not harmed or chilled.

59. I did not immediately abandon the matter. When I was able, I continued trying to get records, clarification, reconsideration, and a lawful resolution. I acted as a pro se citizen trying to understand what the City had done and what process, if any, remained.

60. On March 27, 2025, Moran sent Hill an email about amending the home-occupation ordinance. He referred to amending the home-occupation ordinance definition to exclude certain trades, getting ahead of dangerous occupations, the State getting closer to issuing THC licenses, and a person of interest in town who may try to do something clever. That email is Exhibit 0041.

61. To my knowledge, I was the only person actively seeking to establish a licensed cannabis business in Waterville at that time. I am not aware of any other person in Waterville who fit Moran's March 27 description of a "person of interest" connected to THC licensing and trying to "do something clever."

62. Moran's proposed home-occupation amendment is Exhibit 0042. The City then enacted or treated as operative Ordinance 150.02-2025. The ordinance excluded manufacturing, assembly, growing, packaging for sale, retail sale, and related cannabis/cannabinoid activities from home occupations. That ordinance is Exhibit 0048.

63. On April 24, 2025, OCM sent preliminary approval for my microbusiness application. I understood that preliminary approval was not a final license but moved me into the next steps, including local zoning compliance and inspection. That email is included in Exhibit 0071 and separately appears as Exhibit 0045.

64. On or before April 30, 2025, when I personally delivered a data request at the old City Hall, I spoke with Hill in her back office. No one else was present.

65. During that later conversation, after I learned the City was moving forward with a home occupation amendment, I asked Hill whether the amendment meant the City was going to allow the business in town. Hill said in substance that "we" were not going to allow that business in residential.

66. During that same general conversation, Hill suggested I could go work for the large cannabis company opening in Le Sueur at the old Green Giant factory. I told her I did not want to work for big or corporate cannabis. I wanted to build my own social-equity microbusiness focused on quality, veterans, cancer patients, and helping people.

67. On April 30, 2025, I submitted a public data request to the City. I requested communications and records relating to cannabis, hemp, home-based business, zoning ordinances, and my request. That is Exhibit 0043.

68. On April 30, 2025, I also submitted a reconsideration letter asking the City to reconsider and explaining that I was willing to accept reasonable conditions and inspections. That is Exhibit 0046.

69. In some letters I used words such as application, denial, or permit denial as a non-lawyer describing what I understood as the practical denial of the residential business path. I now understand the legal distinction between a formal final CUP adjudication and the practical denial or closure of the City-selected path that I experienced.

70. On May 7, 2025, Hill responded to my data request. She stated that I had not put in an application for any zoning permits and therefore there was no denial of any permits. She also said attorney client communications would not be disclosed under Minnesota Statutes Section 13.393. That is Exhibit 0047.

71. The May 7 letter is one of the main reasons I believe the process was unfair. The City had routed me through Council and Planning and Zoning, had never given me the formal CUP process, had discussed conditional-use treatment, and then said there was no denial because I had not filed an application for zoning permits.

72. On May 9, 2025, I challenged the City's data response and asked for clarification. That is Exhibit 0049.

73. On May 12, 2025, the City provided additional materials and stated it was disclosing what it believed was attorney-client protected data but would not make a practice of doing so. That is Exhibit 0050.

74. On May 13, 2025, I submitted a formal complaint letter to the City. It explained my concerns about the process, the ordinance, the person-of-interest email, equal treatment, due process, retaliation, data practices, and the harm to me. Those pages are Exhibits 0051 through 0054.

75. On May 15, 2025, Hill responded that the City had reviewed my letter, that I had all data, that the City would take no further action, and that I was free to pursue business in other zones within Waterville if I met state and local requirements. That is Exhibit 0055.

76. The May 15 letter did not tell me that a residential CUP remained available. It did not provide a CUP form. It did not tell me to submit materials to the Zoning Administrator under Section 150.19. It directed me to other zones.

77. On May 23, 2025, I sent a notice of intent to file a federal lawsuit. That is Exhibit 0056.

78. On June 5, 2025, Moran sent a letter stating that the City Council met in closed session to discuss my threat of litigation, returned to open session, and unanimously passed a motion that the City would take no action on my May 23 letter. The letter stated that the City had zones where my proposed business could lawfully operate and that I was free to pursue the business in a lawful zone. That is Exhibit 0057.

79. I understood the June 5 letter as the City's final position. It did not tell me that a residential CUP application remained open. It did not give me a CUP form. It did not direct me to Section 150.19. It directed me to other zones.

80. I did not want to reapply for a residential CUP after that because I understood the City had already made the residential path unavailable, had enacted or implemented an ordinance blocking the home-occupation use, and had told me to pursue other zones. The cost, stress, and medical burden of going through another process that I understood as closed also mattered to me.

81. I have reviewed the City records produced to me in response to my data requests and the materials that I have received or filed in this case. I have not found any City document, email, agenda, letter, notice, or instruction telling me after March 17, 2025 that I could still file a

residential CUP application for my proposed home-garage cannabis microbusiness or that the City would process such an application under the pre-amendment framework.

82. The loss of the Year-One residential launch path stopped my business from opening or operating for even one day. That destroyed my chance to build revenue history, show operating performance, seek financing later, expand later, and fund the charitable mission I had planned.

83. I am not asking in this motion for the Court to award damages now. I am asking to preserve damages categories for later proof, including lost property-use opportunity, lost first-mover/social-equity opportunity, lost launch opportunity, lost revenue and economic opportunity flowing from violation of my personal rights, medical and emotional harm, reputational harm, and delay or loss of the charitable mission.

84. I also had planned related business-to-business opportunities involving seeds, genetics, and starter stock, including a planned arrangement connected to my brother's separate proposed cultivation opportunity in Scott County. That opportunity was separate from my Waterville proposal and was not a substitute location for my Year-One garage launch. I mention it only because my Waterville launch was intended to create seeds, genetics, operating history, and business

capacity for related lawful cannabis opportunities. I am not relying on Scott County as the basis for this Rule 59(e) motion.

85. My earlier damages calculations were conservative because they focused mainly on cannabis flower, seeds, and clones, and did not fully include additional lawful products, services, genetics value, brand value, financing impact, expansion opportunity, related business-to-business opportunities, or the charitable-foundation impact that I intended to pursue after Year-One operations and relocation to a proper zone.

86. The documents I submitted, received, or rely on for this motion are organized under my Master Exhibit system. I do not want them to be renumbered as new Exhibits 1 through 16. The Master Exhibit numbers should be preserved for consistency with my existing record.

87. Exhibits 0020 and 0021 are copies of the January 13 materials that I submitted to the City. Exhibits 0022 through 0024 include early City email communications or City communications that I received or obtained from City records. Exhibits 0025 through 0030 relate to the February 4 Council materials and my presentation materials.

88. Exhibits 0031 through 0038 are City communications and meeting materials relating to the February 19 and March 17 Planning and Zoning process. Exhibits 0032, 0033, 0039, and 0040 are official meeting minutes from the City process to the best of my knowledge.

89. Exhibits 0041 and 0042 are the March 27 Moran email and proposed home-occupation amendment obtained from City records. Exhibit 0048 is Ordinance 150.02-2025 as included in my Master Exhibit system.

90. Exhibits 0043, 0046, 0049, 0051, 0052, 0053, 0054, 0056, and related documents are true and correct copies of letters or requests that I submitted to the City or intended to submit to the City in the sequence reflected in my Master Exhibit Index.

91. Exhibits 0044, 0047, 0050, 0055, and 0057 are true and correct copies of City or City-attorney communications that I received or obtained relating to my data requests, reconsideration efforts, complaint, and notice of intent to sue.

92. Exhibit 0069 is the corrected transcript I prepared from the City-produced March 17 audio. Exhibit 0071 is the OCM Email Compilation, consisting of true and correct copies of OCM related emails and communications in my possession.

93. Other materials, including damages summaries, financing communications, business planning documents, ADA/court-access materials, and broader legal research papers, are not the main proof needed for this Rule 59(e) motion. I understand they may become relevant later for damages, accommodations, discovery, or trial, and I am not waiving those categories by focusing this motion on the City process, ordinance, OCM communications, and City letters.

94. I have tried to be careful in this declaration not to overstate the legal status of what happened. I am not saying that I filed a completed formal CUP application, and I am not saying that the March 17 Planning and Zoning vote was a final City Council CUP adjudication. I am saying that I asked the City what process to follow, the City routed me through a different process, no City official gave me the formal CUP route, the City process communicated that residential conditional-use treatment would not be allowed, the City then enacted or implemented an ordinance excluding the proposed home-occupation use, and the City later told me there was no denial because no zoning-permit application had been filed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 21, 2026


Respectfully submitted,

/s/ Travis Paul Perry

Travis Paul Perry

529 N. Mallory Street

Waterville, MN 56096

Email: mn.snoeeons@gmail.com

Phone: 507-210-0446

Pro Se Plaintiff