**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

~~Travis P. Perry,~~

TRAVIS PAUL PERRY,                    **Case No. 0:25-cv-03352-LMP-LIB**

    __Plaintiff,

    ~~v.~~

~~City of Waterville, Minnesota;~~
    ~~Waterville Planning and Zoning Commission;~~
    ~~Jason Moran, in his individual and official capacities;~~
    ~~Teresa Hill, in her individual and official capacities; and~~
    ~~John and Jane Does 1–10, in their individual and official capacities,~~
    ~~Defendants.~~

~~Case No. _____~~

    **PROPOSED SECOND AMENDED COMPLAINT**

    ~~(42 U.S.C. § 1983; Minn. Stat. ch. 13)~~
    ~~(Bench Trial Requested)~~

~~I. INTRODUCTION~~

v.                    **REQUEST FOR BENCH TRIAL**

CITY OF WATERVILLE, MINNESOTA;

WATERVILLE PLANNING AND ZONING

COMMISSION; JASON MORAN, in his

official and individual capacities; and TERESA

HILL, in her official and individual capacities,

Defendants.

Plaintiff Travis Paul Perry requests a bench trial and pleads as follows:

## I. Nature of the Action

1. This is a civil-rights action under 42 U.S.C. § 1983 and Minnesota law.

2. arising from Defendants' handling of Plaintiff Travis P. Perry is a Minnesota resident, U.S. ArmyPaul Perry's proposed veteran, and " social-equity" applicant under Minnesota's cannabis statute. In early 2025 he sought to operate a cultivation-only cannabis microbusiness as a Level 2 home occupation from at his property at 529 Mallory Street North, Waterville, Minnesota, with no retail sales from his home.

3.1. At that time, the City of Waterville's zoning code allowed Level 2 home occupations in the R-2 residential district by conditional use permit ("CUP"), and the City's own attorney acknowledged on the record that the City legally could approve Plaintiff's proposed use as a conditional useproperty in Waterville, Minnesota.

4. Instead of providing a fair and lawful process, Defendants:

a. Formally denied Plaintiff's request and voted "not to allow [his use] as a use, as a conditional use permit," thereby foreclosing any CUP path for his proposed cultivation-only home occupation;

b. Shortly thereafter drafted and adopted a new "home occupation" ordinance targeted at Plaintiff that explicitly banned the "growing" and sale of cannabis products as home occupations; and

c. Mishandled Plaintiff's data-practices requests in violation of Minn. Stat. ch. 13, withholding non-privileged public data and prematurely closing his requests.

5. Before ever approaching the City, Plaintiff had already applied to the Minnesota Office of Cannabis Management ("OCM") for microbusiness pre-approval as a veteran social-equity applicant. He informed City officials that his state application was pending and that he expected pre-approval based on his veteran status, and that state regulators would inspect and oversee the site after zoning approval.

6. OCM's processing of social-equity applications was later temporarily halted by a court order in separate litigation against the State of Minnesota, which delayed issuance of Plaintiff's pre-approval even though he otherwise met the criteria.

2. After the City's denial and ordinance change, and once OCM resumed processing following the court-ordered pause, OCM issued microbusiness pre-approval to Plaintiff personally as a veteran social-equity applicant, confirming his eligibility under state law. Procedural due process is the core of this case. Plaintiff does not allege that he was automatically entitled to approval, does not ask this Court to approve cannabis operations at his property, and does not ask this Court to function as a zoning board. Plaintiff alleges that Defendants deprived him of a meaningful opportunity to use the City's pre-amendment land-use process before the City adopted a categorical home-occupation exclusion and then relied on the absence of the formal application route Defendants never directed Plaintiff to use.

3. Plaintiff does not allege that his January 13, 2025 written materials were a completed formal CUP application. Plaintiff does not allege that the March 17, 2025 Planning and Zoning vote was a formal final CUP adjudication by the City Council. Plaintiff alleges that the City's own officials selected and controlled a different route, objectively communicated that the residential conditional-use path would not be allowed, adopted an ordinance squarely prohibiting the proposed use, and then took the position that no denial existed because no formal zoning-permit application had been filed.

7. The City's actions are the only reason he was prevented from operating his planned Year-1 business in Waterville and from using his home for lawful cultivation.

8.4. Defendants' actions violated Plaintiff's rights under the Fourteenth Amendment (procedural due process and same connected course of conduct also supports Plaintiff's equal protection) and the /class-of-one claim, First Amendment (retaliation for petitioning), and violated the claim, alternative substantive due process claim, and Minnesota Government Data Practices Act. Plaintiff

seeks **money damages, declaratory relief, and statutory remedies**, but **does not seek injunctive relief** requiring the City to allow any business operations in Waterville or Le Sueur County claim.

---

II. JURISDICTION AND VENUE

## II.  Jurisdiction and Venue

9.5.      This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343 because Plaintiff's federalthe claims arise under the United States Constitution and 42 U.S.C. § 1983.

10.6.    TheThis Court has supplemental jurisdiction over Plaintiff's state-law claimsthe Minnesota Government Data Practices Act claim under 28 U.S.C. § 1367 because they form part ofit arises from the same case or controversy as the federal claims.

11.7.    Venue is proper in this District under 28 U.S.C. § 1391(b) because allDefendants reside in Minnesota and the events giving rise to thesethe claims occurred in Waterville, Minnesota.

---

III. PARTIES

## III.  Parties and Capacities

8.   Plaintiff Travis P.Paul Perry is a natural person domiciled in Minnesota. InPlaintiff is a United States Army veteran, a Stage IV thyroid-cancer survivor, and a Minnesota cannabis social-equity applicant based on his veteran status.

9.   Plaintiff resides at and co-owns the property at 529 N. Mallory Street, Waterville, Minnesota. Plaintiff's father is also a co-owner of the property and supported the proposed use.

12.10.  Plaintiff formed Snoeeons Nurturing Buds and Resources LLC in connection with his microbusiness license application, and as required by OCM, Plaintiff formed a **single-member**

LLC to hold the license.the state cannabis licensing process. Plaintiff is the sole member, 100% owner, and sole decision-maker of that Snoeeons Nurturing Buds and Resources LLC. All OCM pre-approval, business planning, and injuries alleged in this case relate to Plaintiff personally as the sole member.Plaintiff does not seek to represent Snoeeons Nurturing Buds and Resources LLC as a separate plaintiff. Plaintiff asserts his own personal constitutional and statutory injuries, including injury to property-use rights, process rights, veteran/social-equity opportunity, business-launch opportunity, and economic injuries as the individual applicant and owner; he does not assert any separate or independent claims on behalf of the LLC as a distinct entityflowing from violation of his personal rights.

13.11. Defendant City of Waterville, Minnesota ("City") is a Minnesota municipal corporation responsible for adopting and enforcing the ordinances and, policies, actions, decisions, and ratifications challenged in this action.

14.12. Defendant Waterville Planning and Zoning Commission ("P&Z") is an arm of the City responsible for making recommendations and decisions concerning zoning, conditional uses, and home occupations. It is named to ensure complete relief; tobecause it participated in the City-selected process and March 17 vote. To the extent it the Commission is not a separate suable entity, Plaintiff pleads its actions are treatedconduct as actionsconduct of the City of Waterville.

15.13. Defendant Jason Moran was at all relevant times the City Attorney for Waterville. He is sued in his individual capacity for damages and in his official capacity for declaratory and other lawful relief.

16.14. Defendant Teresa Hill was at all relevant times the City Administrator/ Clerk for Waterville. She is sued in her individual capacity for damages and in her official capacity for declaratory and other lawful relief.

17. Defendants **John and Jane Does 1–10** are additional City officials, staff, and/or P&Z or Council members who participated in, directed, or ratified the unconstitutional conduct alleged herein. Many of these individuals are identified by name in the meeting agendas and transcripts, but their precise roles, responsibilities, and legal capacities are not yet fully determined. Plaintiff will amend this Complaint to substitute their names once their identities and roles are confirmed.

---

IV. FACTUAL ALLEGATIONS

A. Plaintiff's background, OCM application, and business plan

## IV.  Exhibits, Incorporation, and Construction

15. The documents and exhibits submitted with this filing and identified by Plaintiff's Master Exhibit numbers are incorporated by reference under Federal Rule of Civil Procedure 10(c) to the extent they are attached to or submitted with this Proposed Second Amended Complaint and specifically cited or relied upon in this pleading. Plaintiff uses Master Exhibit numbers to preserve consistency with the existing record, prior docketed exhibits, and Plaintiff's exhibit files.

16. If a characterization in this pleading conflicts with an attached or incorporated exhibit, the exhibit controls. Plaintiff pleads facts based on the exhibits, his personal knowledge, and reasonable inferences from the City-produced record.

17. Plaintiff relies particularly on Master Exhibits 0020 through 0023, 0025 through 0037, 0039 through 0042, 0043 through 0057, 0069, and 0071 for the Rule 59(e) motion and this proposed pleading.

18. Plaintiff also preserves damages, business-planning, medical impact, court-access, and later proof categories that may be addressed through discovery, expert proof, dispositive motions, or trial. The Rule 59(e) filing focuses on the City process, OCM/local-zoning communications, ordinance change, City letters, and March 17 transcript because those are the materials most directly tied to reopening and pleading sufficiency.

## V. Plaintiff's Background, Property, Business Planning, and OCM Process

18.19. Plaintiff is a U.S. Army veteran and a long-time organic cultivator. He qualifies as a "veteran social-equity" applicant under Minnesota's cannabis statuteMinnesota's cannabis program. His veteran status was personal to him and was the reason for his social-equity qualification.

20. In 2024, Minnesota enacted a regulatory scheme for cannabis Plaintiff began planning the cannabis microbusiness and related charitable mission around 2022 after surviving Stage IV thyroid cancer and entering remission. The business was intended to provide Plaintiff a way to earn income despite serious disabilities and to eventually support a charitable foundation for disabled veterans, cancer survivors, and others with serious medical conditions.

21. Plaintiff cannot maintain ordinary employment because of serious health conditions, including the effects of cancer treatment, absence of a thyroid after total thyroidectomy, chronic pain, and stress-related non-epileptic seizures. The proposed business was therefore personally important and not merely speculative or recreational.

22. Plaintiff's Year-One plan was to start in the attached garage at his residential property. The purpose of the home-garage launch was to generate revenue, build an operating history, establish proof of concept, and later pursue financing or expansion into a commercial or industrial location.

23. Plaintiff planned Year-One cultivation and seed production. If allowed, Plaintiff also planned limited non-solvent processing such as cannabis butter and heat-press/rosin processes. Plaintiff did not plan butane, CO2, ethanol, or solvent extraction at the home.

24. Plaintiff did not plan retail traffic or customer purchases at the home. Plaintiff intended wholesale sales or lawful online and dispensary sales channels and told the City he did not want people coming to his house for purchases.

25. Plaintiff planned odor controls, carbon filters, security measures, locks, doors, compliance measures, inspections, and reasonable conditions. Plaintiff also planned organic cultivation methods, including organic inputs, soil blends, worm composting/worm castings, and no synthetic chemical pesticide use.

26. Plaintiff's planned business was personally tied to Plaintiff's own labor, property, background, and specialized practical skills. Plaintiff has been an organic gardener for more than twenty years and has experience with soil creation, organic nutrients, plant cultivation, seed creation, plant breeding, construction, concrete work, metal work, welding, horticulture, agriculture, soil science, mycology, watering systems, lighting, filtration, and facility buildout.

27. Plaintiff also previously worked professionally in mold remediation, including work involving mold, water damage, dampness, moisture, fire damage, and related environmental issues. Those skills were directly relevant to Plaintiff's planned Year-One garage launch because cannabis cultivation required moisture control, mold prevention, air quality, filtration, sanitation, water management, and environmental controls.

28. Plaintiff's Year-One residential garage plan was limited to cultivation, seed production, genetics development, clones, and simple non-solvent processing such as heat-press/rosin processes and cannabis butter. Plaintiff did not plan chemical or solvent extraction at the residential garage.

Plaintiff intended to expand into broader lawful cannabis products only after generating operating history and relocating to a properly zoned commercial or industrial location.

29. Plaintiff had personally bred or developed approximately four strains and intended to sell or use seeds, clones, and genetics from strains he created. The loss of the Year-One launch path therefore affected not only flower revenue, but also genetics, seeds, clones, later expansion, and related business-opportunity categories to be proven later.

30. Plaintiff understood OCM would not allow cannabis business activities in a dwelling or access to the business area by passing through a dwelling. Plaintiff intended to remove, wall off, seal, or otherwise separate the interior door/access between the dwelling and attached garage as needed so the business area could be accessed without passing through a dwelling.

31. OCM communications confirmed that local zoning was a local-government issue and that applicants needed to work with local governments to determine zoning requirements. Ex. 0071.

32. OCM preliminary approval did not authorize operations. It meant Plaintiff still needed final plans, local zoning compliance, inspection, final license steps, and OCM approval. Exs. 0045, 0071.

## VI.  Pre-Amendment City Zoning Framework and Why the Lost Process Mattered

33. Plaintiff's property is in a residential zoning district, identified by the City and Court as R-2, and is also within a shoreline/flood-fringe context.

34. Before the ordinance amendment challenged in this case, the City's zoning code recognized home occupations and distinguished between Level 1 and Level 2 home occupations.

35. Level 2 home occupations were higher-intensity home occupations and could be considered through a conditional use permit in the R-2 district under the City's code.

36. The pre-amendment home-occupation framework did not expressly and categorically exclude cannabis growing/cultivation from all home occupations. The later ordinance amendment added a categorical exclusion for cannabis-related growing and related activities.

37. The City separately allowed cannabis or cannabinoid manufacturing and retail-related uses in certain commercial or industrial districts, in some circumstances as permitted uses and in others as conditional uses. The existence of industrial options did not answer whether Plaintiff had a meaningful opportunity to pursue a Year-One home-garage launch under the pre-amendment home-occupation framework.

38. The pre-amendment process mattered because Plaintiff's only realistic Year-One launch path was his own property. Plaintiff did not have the money, operating history, or health capacity to begin by leasing or buying a commercial or industrial location. The Year-One home launch was intended to create the revenue history needed for later expansion.

39. Plaintiff does not claim the City was required to approve every possible cannabis use in every zone. Plaintiff claims that before the City changed the home-occupation definition, he was entitled to meaningful notice and an opportunity to use the local process the City later said he should have used.

## VII.   City Hall Gatekeeping and January-February 2025 Routing

40. In early January 2025, before submitting written materials, Plaintiff went to old City Hall and asked Hill what local process he needed to follow to start the business lawfully.

41. Plaintiff told Hill he was a Stage IV thyroid-cancer survivor, had no thyroid after thyroidectomy, was a United States Army veteran, qualified for social equity based on veteran status, and was trying to build a lawful business because ordinary employment was not realistic for him.

42. Hill did not give Plaintiff a CUP form, did not identify a Zoning Administrator, did not mention a

fee, did not request a site map or written/graphic materials, did not cite Section 150.19, and did not tell Plaintiff to file a formal CUP application.

43. Instead, Hill routed Plaintiff to the City Council. Plaintiff relied on that instruction from the City's Administrator-Clerk.

44. On or about January 13, 2025, Plaintiff submitted written materials to the City because Hill had routed him to the Council. Exs. 0020-0021. Those materials requested consideration of a home-based cannabis microbusiness and a lawful zoning path.

45. On January 21 or 22, 2025, City communications confirmed the matter was being placed on the City Council agenda. Ex. 0022.

46. On January 22, 2025, Moran sent an email discussing Council-first handling and concerns including odor, crime, delivery, manufacturing, precedent, and tightening the home-occupation ordinance. Ex. 0023.

47. The January 22 email shows that before the public process had concluded, the City Attorney was already considering tightening the ordinance in response to Plaintiff's request.

48. On February 4, 2025, the City Council agenda identified the item as 'Home-Based Cannabis Micro Business Amendment Request-Travis Perry.' Ex. 0025.

49. Plaintiff appeared at the February 4 meeting and tried to explain his proposal and personal reasons for seeking a lawful home-based startup path. Exs. 0026-0030.

50. After February 4, the City did not provide a CUP form or direct Plaintiff into a formal CUP application. Instead, the matter continued through the City's selected Council/Planning-and-Zoning route.

51. On February 13, 2025, Hill confirmed the Planning Commission would discuss the requested ordinance amendment on February 19. Ex. 0031.

52. On February 19, 2025, Planning and Zoning discussed the request. The minutes and materials show the matter remained framed as a home-cannabis/zoning amendment issue rather than a formal CUP application. Exs. 0032-0033.

53. During or around the February 19 process, Hill stated in substance that the matter was being treated as a permitted-use/home-occupation issue and that either way an amendment would be needed. The matter was tabled so Moran could attend a later meeting.

**VIII.    March 17, 2025 Meeting, Conditional-Use Language, and Practical Closure of the Residential Path**

54. Before March 17, Hill and Moran exchanged communications about the upcoming meeting and the 'marijuana micro business' issue. Exs. 0034-0038.

55. On March 17, 2025, Planning and Zoning held a meeting concerning Plaintiff's request. The official minutes are Exhibits 0039 and 0040. The corrected transcript prepared from City produced audio is Exhibit 0069.

56. Moran began by describing the request as one to allow cannabis manufacture and retail sale in residential zones, and Plaintiff clarified cultivation plus butter/heat press. Ex. 0069, lines 24-35.

57. Moran discussed existing zones and City concerns including odor, noise, traffic, waste, security, break-ins, and attractive nuisance concerns. Ex. 0069, lines 50-58, 73-88.

58. Plaintiff explained that he did not want people coming to his house for purchases and that sales would be online, per harvest, through dispensaries, or other lawful licensed channels. Ex. 0069, lines 73-88.

59. A Commission member acknowledged Plaintiff might run the cleanest and best possible operation but worried about future applicants. Ex. 0069, lines 103-108.

60. Plaintiff tried to focus the discussion on cultivation as the main Year-One issue. Ex. 0069, lines 114-126.

61. Moran explained that if the City made a use conditional, it could impose conditions, hold hearings, make findings, revoke for violations, and create an appeal path. Ex. 0069, lines 142154.

62. Plaintiff asked whether the City could change the matter to a conditional use. Moran responded in substance that legally there was a way, but he argued against doing so. Ex. 0069, lines 169-179.

63. The meeting ended with a motion and vote using language that Plaintiff understood as denying the zoning change and not allowing the use as a conditional use permit. Ex. 0069, lines 183-199.

64. Plaintiff does not plead that March 17 was a formal final CUP adjudication by the City Council. Plaintiff pleads that the City-selected process objectively communicated that the residential conditional-use path would not be allowed before Plaintiff had ever been given the formal CUP process.

65. After March 17, no City official told Plaintiff that a formal CUP application remained available for the proposed residential cannabis microbusiness. No City official gave Plaintiff a CUP form, identified a fee, identified the Zoning Administrator, requested site-plan materials, or told Plaintiff to file under Section 150.19.

## IX.  March 27 Amendment Email, Ordinance 150.02-2025, and Categorical Exclusion

66. On March 27, 2025, Moran sent Hill an email titled 'Possible Amendment to Home Occupation Ordinance.' Ex. 0041.

67. In that email, Moran suggested amending the home-occupation definition to exclude certain trades, stated he wanted to get ahead of dangerous occupations, referenced the State getting closer to issuing THC licenses, ~~including microbusiness licenses. The City of~~ and referred to a 'person of interest in town' who might 'try to do something clever.' Ex. 0041.

68. To Plaintiff's knowledge, Plaintiff was the only person actively seeking to establish a licensed cannabis business in Waterville at that time and the only person who fit Moran's description.

69. The proposed amendment attached to the March 27 email is Exhibit 0042.

70. The City later adopted Ordinance ~~116 and related~~ 150.02-2025. Ex. 0048.

71. Ordinance 150.02-2025 amended the home-occupation definition to exclude manufacturing, assembly, growing, packaging for sale, retail sale, and related activity for cannabis products, cannabis concentrate, cannabis flower, and other cannabinoids, among other listed activities. Ex. 0048.

72. The ordinance targeted the category of activity Plaintiff had asked to pursue from his home. It eliminated the pre-amendment home-occupation path for the proposed Year-One residential garage launch.

73. As amended, Ordinance 150.02-2025 squarely prohibited Plaintiff's proposed home-garage cannabis microbusiness by excluding cannabis growing, packaging for sale, retail sale, and related cannabis/cannabinoid activities from the home-occupation definition. That categorical exclusion made a later formal residential CUP application ineffective or unavailable for this specific proposed use.

## X.  OCM Preliminary Approval and Local Zoning Gatekeeping

74. OCM communications before and after the City process confirmed that Plaintiff was a qualified or continuing social-equity applicant but could not operate until completing additional steps. Ex. 0071.

75. OCM informed Plaintiff that OCM verifies local zoning compliance as part of licensing but does not dictate local zoning requirements; applicants must contact the local unit of government to determine zoning requirements. Ex. 0071.

76. On April 24, 2025, OCM issued preliminary license approval for Plaintiff's microbusiness application. Exs. 0045, 0071.

77. The preliminary approval required Plaintiff to continue through local-government zoning compliance, final plans, inspections, payment of fees, and issuance of a final license before operations.

78. The City's local zoning position therefore mattered directly. OCM could not cure the City's categorical exclusion or the City's refusal to provide a meaningful local process.

## XI.  Data Requests, Reconsideration, Formal Complaint, and Final City Position

19. 79. On April 30, 2025, Plaintiff submitted a public data request seeking communications and records relating to cannabis, hemp, home-based businesses, zoning ordinances incorporating Minnesota's cannabis definitions and authorizing cannabis-related uses as conditional uses in certain districts, and Plaintiff's request. Ex. 0043.

20. Before approaching the City about zoning, Plaintiff submitted an application to **OCM** for microbusiness pre-approval as a veteran social-equity applicant. He reasonably expected pre-approval under the statute and told City officials that his state application was pending and that state regulators would inspect and oversee the site after zoning approval. OCM's processing of social-equity applications was later **temporarily halted by a court order in**

separate litigation, which delayed issuance of Plaintiff's pre-approval even though he otherwise met the criteria.

21. Plaintiff developed a phased business plan:

a. **Year 1 (2025)** – a **cultivation-only microbusiness** from his residential property's attached or detached garage at 529 Mallory Street North in Waterville, producing cannabis flower for **wholesale only** with **no retail sales from the residence**, no customer traffic, and robust odor and security controls;

b. **Years 2 and beyond** – relocation of operations to a fully compliant commercial site in an industrial district, including retail and expanded cultivation, financed in significant part by Year-1 income.

22. Plaintiff's initial Year-1 plan relied on the City's existing zoning framework for **home occupations** and conditional uses and was designed to be low-impact and fully compliant with state and local law.

**B. Zoning ordinances in effect at the time of denial**

23. Plaintiff's property at 529 Mallory Street North is zoned **R-2 Medium Density Residential** and lies within the **Flood Fringe** overlay district.

24. At all relevant times through at least **February 19, 2025**, the City's zoning code allowed **home occupations** in the R-2 district. The code distinguished between **Level 1** home occupations (permitted by right) and **Level 2** home occupations (permitted in R-2 by **conditional use permit**).

25. Under the pre-amendment code, **Level 2 home occupations** were allowed in R-2 if approved by CUP, based on neutral criteria such as impact on neighboring properties, traffic, noise, and nuisances. The code did not contain any categorical prohibition on the "growing" of cannabis as a home occupation.

26. Separate City ordinances authorized **cannabinoid/cannabis product manufacturing and retail** as conditional uses in the City's industrial districts (such as IL and I-2).

27. At the time Plaintiff approached the City in January 2025, the City's ordinances therefore allowed a path for **Level 2 home occupations in R-2 by CUP**, and did not yet contain a blanket ban on cannabis cultivation as a home occupation.

**C. Plaintiff's request and the P&Z decision**

28. On or about **January 13, 2025**, Plaintiff submitted a written request to the City describing his proposed cultivation-only microbusiness, explaining that operations would occur entirely indoors in his garage, with no retail sales from the residence, minimal traffic, extensive odor control, and security measures. He also informed the City that his OCM microbusiness application as a veteran social-equity applicant was already pending.

29. On or about **February 4, 2025**, Plaintiff submitted a further letter and appeared before the City Council. The Council's agenda identified the matter as "Home-Based Cannabis Micro Business Amendment Request – Travis Perry." The Council referred the matter to the Planning and Zoning Commission.

30. Plaintiff made clear in his written materials and public comments that he was seeking a lawful zoning path, including by conditional use permit, consistent with the City's existing Level-2 home-occupation framework, and that he was **not** seeking to sell cannabis at retail from his residence.

31. On **February 19, 2025**, the P&Z Commission held a public meeting at which Plaintiff's request was discussed. Defendant Moran presented the item to the Commission and described Plaintiff's proposal.

32. At that meeting, Moran acknowledged that the City's code already allowed cannabis manufacturing and related uses as conditional uses in industrial districts, and that the City could, as a matter of law, treat Plaintiff's cultivation-only home occupation as a conditional use.

33. Moran stated in substance that the City **could legally make Plaintiff's use a conditional use** and impose extensive conditions, but then told the Commission that, "legally, can we [allow it]? **Yes.** Should we? **No.**"

34. Moran repeatedly compared Plaintiff's proposed cultivation-only microbusiness to manufacturing **gunpowder, fireworks, or dynamite** in a residential neighborhood and warned the Commission about imagined "worst-case scenarios." These analogies were not based on any evidence about Plaintiff's actual plan.

35. During the same meeting, the Commission did not apply the existing CUP criteria to Plaintiff's specific plan, did not analyze whether conditions could mitigate any impacts, and did not provide Plaintiff with a meaningful opportunity to have his proposed use evaluated under the existing Level-2 framework.

36. Instead, following Moran's recommendations, the Commission voted to **"deny the request"** and **"not to allow [Plaintiff's use] as a use, as a conditional use permit."**

37. By that vote, the City effectively eliminated the CUP path for Plaintiff's proposed cultivation-only home occupation in R-2 and made any formal CUP application **futile**, even though the code still allowed Level-2 home occupations by CUP for others.

38. During the meeting, P&Z Chairperson **Howard Mack** remarked that Plaintiff could "do whatever [he] want[s] right now" and "go down the road of forgiveness instead of permission," suggesting that Plaintiff should operate without permits rather than pursuing lawful approvals. This comment, made by the presiding P&Z official, underscored the City's

refusal to provide a fair process and its willingness to push Plaintiff toward extra-legal options instead of applying its own CUP framework.

### D. Retaliatory "home occupation" amendment

39. Following the P&Z denial, Moran drafted an amendment to the City's "Home Occupation" ordinance and circulated it internally. In related communications he referred to a "person of interest in town that may try to do something clever," referring to Plaintiff.

40. The draft amendment redefined "Home Occupation" and expressly excluded from that definition any "manufacturing, assembly of, growing of, packaging for sale of, or retail sale of" cannabis product, cannabis concentrate, cannabis flower, cannabinoid products, and certain other items such as fireworks, explosives, and firearms.

41. On or about **April 1, 2025**, the City Council held a meeting at which Moran presented the proposed amendment. He stated that the amendment was intended to "get ahead" of undesirable home-based occupations in residential areas and expressly referenced cannabis-related activity.

42. On or about **May 6, 2025**, after a second reading, the City adopted the amended "Home Occupation" ordinance. The amendment permanently barred any "growing" of cannabis or cannabinoid products as a home occupation, even where impacts could be addressed through CUP conditions.

43. The timing, language, and internal commentary surrounding this ordinance demonstrate that it was drafted and adopted **in direct response to Plaintiff's requests and speech**, and that it was aimed at preventing Plaintiff from ever obtaining approval for his cultivation-only home occupation.

### E. OCM pre-approval and damages

44. After the City's denial and the adoption of the amended ordinance, and once OCM resumed processing following the court-ordered pause, OCM issued **microbusiness pre-approval to Plaintiff personally** as a veteran social-equity applicant. OCM's pre-approval confirmed that, from the State's perspective, Plaintiff's proposed operation was eligible to proceed subject to zoning and site inspection.

45. But for the City's denial of any CUP path and adoption of the targeted "Home Occupation" amendment, Plaintiff would have been able to proceed with Year 1 cultivation in Waterville under his OCM pre-approval and then expand to a commercial site in later years.

46. Plaintiff has suffered substantial economic damages, including:

a. Lost net income from the Year-1 cultivation-only operation he planned to operate from his garage, with conservative net-profit estimates based on realistic yields, wholesale pricing, and operating costs;

b. Lost net income from planned expansion in subsequent years, including retail operations, resulting in multi-year and multi-million-dollar losses;

c. Loss of the unique timing and market advantage conferred by his early social-equity pre-approval; and

d. Related emotional distress and reputational harm.

47. Plaintiff has submitted sworn declarations and supporting exhibits detailing his expected yields, market-based pricing, operating costs, and financing sources (including supporting affidavits from experienced cultivators and prospective investors), demonstrating that his projections are realistic and non-speculative.

**F. Data-practices requests and violations**

48. In the spring of 2025, Plaintiff submitted written requests under the **Minnesota Government Data Practices Act (MGDPA), Minn. Stat. ch. 13**, seeking public records concerning his application, the P&Z proceedings, the new ordinance, and communications with the City Attorney.

49. The City acknowledged receipt of these requests but improperly withheld non-privileged public data, broadly invoked attorney-client privilege for entire categories of documents, and declared Plaintiff's request "complete" and "closed" while still withholding responsive data.

50. The City's responses failed to comply with the requirements of Minn. Stat. § 13.03 and related provisions, which require prompt, thorough, and good-faith responses to requests for public government data.

51. The City's mishandling of Plaintiff's data-practices requests impeded his ability to obtain information about the City's decision-making, to correct inaccuracies, and to timely challenge the City's actions.

---

**V. CLAIMS FOR RELIEF**

**COUNT I – FOURTEENTH AMENDMENT**

**PROCEDURAL DUE PROCESS**
42 U.S.C. § 1983
(Against All Defendants)

52. Plaintiff realleges paragraphs 1–51.

53. At the time Plaintiff requested approval for his cultivation-only home occupation, the City's zoning code provided a **Level-2 home occupation** and **conditional use permit** framework in the R-2 district. This framework created a **legitimate claim of entitlement** to a fair, non-arbitrary process and consideration under the existing criteria.

54. Defendants deprived Plaintiff of that protected interest without due process of law by:

   a. Formally denying his request and voting "not to allow [his use] as a use, as a conditional use permit," thereby eliminating the CUP path for his use;

   b. Refusing to apply existing CUP standards to Plaintiff's specific plan, instead relying on speculative "worst-case" analogies to explosives and dynamite; and

   c. Drafting and adopting a targeted ordinance amendment that retroactively foreclosed Plaintiff's proposed use as a home occupation.

55. After the P&Z vote, any further administrative remedy—such as submitting a formal CUP application—was **futile** because Defendants had already decided that Plaintiff's use would not be considered as a conditional use.

56. Defendants' actions were arbitrary and capricious, motivated by hostility rather than by neutral application of zoning criteria, and deprived Plaintiff of a meaningful opportunity to pursue a lawful land-use approval process.

57. By depriving Plaintiff of a fair and lawful process without adequate procedural safeguards, Defendants violated Plaintiff's rights under the **Due Process Clause of the Fourteenth Amendment**, actionable under **42 U.S.C. § 1983**.

80. As a direct and proximate result, Plaintiff has suffered economic loss, emotional distress, and On April 30, 2025, Plaintiff also submitted a reconsideration letter asking the City to reconsider and explaining that he was willing to comply with reasonable conditions, inspections, and regulations. Ex. 0046.

81. On or before April 30, when Plaintiff personally delivered the data request, Plaintiff spoke with Hill in her back office. Plaintiff asked whether the amendment meant the City would allow the business in town. Hill stated in substance that 'we' were not going to allow that business in residential.

82. Hill also suggested Plaintiff could work for the large cannabis company opening in Le Sueur at the old Green Giant factory. Plaintiff rejected that idea because he was trying to build his own social-equity microbusiness, not work for large corporate cannabis.

83. On May 7, 2025, Hill responded to the data request. Ex. 0047.

84. Hill's May 7 letter stated that Plaintiff had not put in an application for any zoning permits and that therefore there was no denial of any permits. Ex. 0047.

85. Hill's May 7 letter also stated that attorney-client communications would not be disclosed under Minnesota Statutes Section 13.393. Ex. 0047.

86. The May 7 letter is central to the procedural due process claim. After routing Plaintiff through Council and Planning and Zoning, after conditional-use language was used on March 17, and after the City moved toward and adopted a categorical exclusion, the City asserted there was no denial because Plaintiff had not filed the formal application nobody had directed him to file.

87. On May 9, 2025, Plaintiff sent a clarification and MGDPA challenge letter. Ex. 0049.

88. On May 12, 2025, the City produced additional material and stated it would not make a practice of disclosing attorney-client data. Ex. 0050.

89. On May 13, 2025, Plaintiff submitted a formal complaint to the City. Exs. 0051-0054.

90. The May 13 complaint raised Plaintiff's concerns about due process, equal treatment, retaliation, data practices, the 'person of interest' email, and damages. Exs. 0051-0054.

91. On May 15, 2025, Hill wrote that the City had reviewed Plaintiff's letter, that the City would take no further action, and that Plaintiff was free to pursue his business in other zones within Waterville if he met state and local regulations. Ex. 0055.

92. On May 23, 2025, Plaintiff sent a notice of intent to file a federal lawsuit. Ex. 0056.

93. On June 5, 2025, Moran wrote that the City Council met in closed session to discuss Plaintiff's litigation threat, returned to open session, and unanimously voted that the City would take no action on the May 23 letter. Ex. 0057.

94. The June 5 letter stated that the City had zones available where Plaintiff's proposed business could lawfully operate and that Plaintiff was free to pursue his business in a zone where it was lawfully permissible. Ex. 0057.

95. The June 5 letter did not tell Plaintiff that a residential CUP application remained available. It did not provide a CUP form. It did not mention Section 150.19. It directed Plaintiff to other zones and stated the City would take no action.

## XII.  Injury, Standing, and Damages

96.  Plaintiff preserves the argument that damages flow from personal constitutional violations even when the economic opportunity involved a single-member entity. Plaintiff does not ask to represent Snoeeons Nurturing Buds and Resources LLC as a separate plaintiff; he seeks damages ~~in an amount~~for personal injuries, including economic losses caused by alleged deprivation of his own property-use rights, process rights, veteran/social-equity opportunity, and business-launch opportunity.

97.  Defendants' actions stopped Plaintiff's proposed business from opening or operating for even one day from his residential property.

98.  The loss of the Year-One residential launch path caused Plaintiff to lose the opportunity to generate first-year revenue, build operating history, pursue future financing, expand later, and fund his planned charitable mission.

~~58.~~99.  Plaintiff seeks damages to be proven at trial, including loss of meaningful process, loss of personal property-use opportunity, loss of first-mover and social-equity opportunity, loss of

business-launch opportunity, lost first-year revenue opportunity, lost operating history, lost financing and expansion opportunity, lost genetics/seed/clone opportunity, lost revenue and economic opportunity flowing from Defendants' alleged violation of Plaintiff's personal constitutional rights, medical and emotional harm, reputational harm, delay or loss of ability to fund Plaintiff's planned charitable foundation, nominal damages, costs, and all other relief allowed by law.

---

COUNT II – FOURTEENTH AMENDMENT
EQUAL PROTECTION (CLASS-OF-ONE / IRRATIONAL DISCRIMINATION)
42 U.S.C. § 1983
(Against All Defendants)

59. Plaintiff realleges paragraphs 1–58.

60. The City's zoning code allows a variety of **Level-2 home occupations** in the R-2 district, including businesses that create potential impacts such as traffic, deliveries, or other externalities, so long as those impacts can be addressed through conditions.

61. Plaintiff's proposed use—a cultivation-only cannabis microbusiness operated entirely indoors in a garage, with no retail at the residence, minimal traffic, odor control, and security measures—was **similarly situated** in all relevant respects to other Level-2 home occupations that the City allows.

100. Plaintiff does not seek to represent Snoeeons Nurturing Buds and Resources LLC as a separate plaintiff. Plaintiff seeks damages for his own personal injuries, including injuries tied to his property interest, veteran/social-equity qualification, personal licensing opportunity, and the business opportunity that Defendants' actions allegedly prevented from ever launching.

101. The City process caused severe stress and worsened Plaintiff's medical symptoms, including stress-related seizure problems. Plaintiff's continued petitioning does not mean Defendants' conduct was harmless; Plaintiff continued because the business and property opportunity were critically important to him.

### XIII.   Municipal Liability

102. The City is liable under Section 1983 because the alleged violations were caused by official municipal policy, final policymaker action, and ratification, not merely by respondeat superior. 103. The ordinance amendment itself was official City policy enacted by the City's governing body.

104. The Council's June 5 no-action vote after closed-session discussion of Plaintiff's litigation notice was final policymaker action or ratification of the City's position.

105. Hill and Moran acted under color of state law and within their City roles when routing Plaintiff's request, communicating City positions, advising on zoning, handling data responses, preparing or transmitting ordinance materials, and communicating the final City response.

106. The Planning and Zoning Commission functioned as part of the City's official land-use process. To the extent it is not separately suable, its actions are pleaded as actions of the City.

### COUNT I - 42 U.S.C. § 1983 - Procedural Due Process

107. Plaintiff incorporates all preceding paragraphs.

108. Plaintiff had protected interests including his personal property-use opportunity, his ability to invoke the pre-amendment local land-use framework, his veteran/social-equity licensing opportunity, and his opportunity to seek a lawful home-occupation/CUP review before the City categorically excluded the proposed use.

109. Defendants, acting under color of state law, deprived Plaintiff of meaningful process by selecting and controlling a non-CUP route, failing to provide the formal CUP route despite Plaintiff asking City Hall what process to follow, objectively communicating that residential conditional-use treatment would not be allowed, adopting a categorical exclusion, and later asserting no denial occurred because no formal zoning application had been filed.

110. The process provided was constitutionally inadequate because Plaintiff was never given clear notice of the formal procedure the City later claimed he was required to use, never given a meaningful pre-amendment opportunity for individualized review under the Level 2 home occupation/CUP framework, and was later directed to other zones after the City had adopted an exclusion for the proposed home use.

111. Plaintiff does not claim that the Constitution required the City to approve the business. Plaintiff claims the Constitution required a meaningful and fair process before the City deprived him of the pre-amendment opportunity and then used the lack of a formal application as a defense.

112. Defendants' conduct caused Plaintiff damages, including but not limited to the damages described above.

**COUNT II - 42 U.S.C. § 1983 - Equal Protection / Class-of-One**

113. Plaintiff incorporates all preceding paragraphs.

114. Plaintiff was, to his knowledge, the only person actively seeking to establish a licensed cannabis business in Waterville at the relevant time and the only person who fit Moran's 'person of interest' description.

~~62.~~ 115. Defendants intentionally treated Plaintiff differently from ~~similarly situated persons by:~~ ordinary home-occupation and land use applicants by responding to his specific request with generalized fear-based and stigma based treatment, dangerous-occupation comparisons, a targeted home-occupation amendment, and no individualized review under the existing pre-amendment framework.

   ~~a. Voting to deny his request and to refuse to allow his use as a conditional use permit, while leaving other Level-2 home occupations available to others through the CUP process;~~

b. Drafting and adopting an ordinance amendment that expressly excluded cannabis cultivation and a short list of disfavored items (firearms, explosives, fireworks) from the definition of "home occupation," thereby singling out Plaintiff's class of use; and

c. Doing so in direct response to Plaintiff's request, using inflammatory analogies to explosives and referring to Plaintiff as a "person of interest" who might "do something clever."

116. Defendants lacked ~~any~~a rational basis for ~~this differential~~singling Plaintiff out for categorical treatment. ~~Any legitimate concerns about safety,~~ without individualized consideration of his actual proposed restrictions, including no walk-in retail customers, no solvent extraction, odor/security~~, or nuisance could have been addressed by imposing~~ controls, organic methods, inspections, and willingness to accept reasonable conditions ~~under the CUP process, as with other Level-2 home occupations~~.

64. To Plaintiff's knowledge, at the time of his request he was **the only person seeking City approval for a cannabis business or cannabis-related home occupation in Waterville**. By selectively and categorically excluding Plaintiff's cultivation-only use, while allowing other similarly intensive home occupations to proceed through the Level-2/CUP framework, Defendants acted irrationally and with animus toward Plaintiff and toward cannabis operators.

65. By intentionally and irrationally treating Plaintiff differently from others similarly situated without a rational basis, Defendants violated Plaintiff's rights under the **Equal Protection Clause of the Fourteenth Amendment**, actionable under **42 U.S.C. § 1983**.

117. ~~As a direct and proximate result,~~In the alternative, even if cannabis-related zoning can be regulated generally, Defendants' targeted treatment of Plaintiff and his specific request was arbitrary and irrational as applied.

118. Defendants' conduct caused Plaintiff damages.

~~66.~~ **COUNT III - 42 U.S.C. § 1983 - First Amendment Retaliation / Petition Clause** 119. Plaintiff ~~has suffered damages in an amount to be proven at trial.~~

~~COUNT III – FIRST AMENDMENT~~

RETALIATION FOR PROTECTED PETITIONING AND SPEECH
42 U.S.C. § 1983
(Against All Defendants)

67. Plaintiff reallegesincorporates all preceding paragraphs 1–66.

68. Plaintiff engaged in constitutionally protected First Amendment activity by:

a. Submitting petitioning City officials, submitting written requests to the City concerning his proposed cultivation-only microbusiness and zoning;

b. Speaking, speaking at public meetings and advocating for a lawful path for his use;

c. Submitting, requesting reconsideration, submitting public records data requests under, challenging the MGDPA; and

d. Providing notice of his intent to pursue legal action to vindicate his rights.

120. InCity's data response to Plaintiff's protected speech and petitioning, , filing a formal complaint, and sending a notice of intent to sue.

69.121. Defendants took adverse actionsaction that would chill a person of ordinary firmness from continuing to engage in such activities, including:petition, including using municipal power to adopt a targeted categorical exclusion, referring

a. Denying his request and voting not to allow his use as a conditional use permit;

b. Drafting and adopting a targeted "home occupation" amendment aimed at permanently preventinga 'person of interest' who might 'try to do something clever,' refusing further action, and directing Plaintiff away from operating his cultivation-only microbusiness in Waterville; and

c. Refusing to take corrective actionthe residential property path after being notified of the harms caused by their actionshe petitioned.

70. The chronology of events, Defendants' public and private statements, and the framing of Plaintiff as a "person of interest" whose proposal should be stopped, demonstrate that Defendants' adverse actions were substantially motivated by Plaintiff's protected petitioning and criticism.

71. By taking adverse zoning and legislative actions in retaliation for Plaintiff's protected First Amendment activity, Defendants violated Plaintiff's rights under the **First Amendment**, actionable under **42 U.S.C. § 1983**.

72. As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

122. Plaintiff continued to petition because of the importance of the business, his property, and his unusual persistence. His continued petitioning does not defeat the claim because the ordinary firmness inquiry is objective.

123. The timing and content of the City's actions support a plausible inference of retaliatory motive. Plaintiff petitioned for a home cannabis business path; City officials expressed concern and discussed tightening the ordinance; after Plaintiff's public participation, Moran circulated the 'person of interest' amendment email; the City enacted the exclusion; and after Plaintiff's formal complaint and notice of intent to sue, the City voted to take no action.

124. Defendants' retaliation caused Plaintiff damages.

**COUNT IV** – MINNESOTA GOVERNMENT DATA PRACTICES ACT
Minn. Stat. § 13.08
(Against City of Waterville and Teresa Hill)

73. Plaintiff realleges **42 U.S.C. § 1983 - Alternative Substantive Due**

**Process** 125. Plaintiff incorporates all preceding paragraphs 1–72.

74. Plaintiff made data-practices requests to the City pursuant to **Minn. Stat. ch. 13**, seeking public government data relating to his application, the P&Z proceedings, the new ordinance, and communications among City officials.

75. Under **Minn. Stat. § 13.03** and related provisions, the City was required to respond promptly and to provide access to public government data that were not subject to a valid statutory exception.

76. The City, acting through Defendant Hill and others, violated the MGDPA by:

a. Withholding non-privileged public data;

b. Invoking the attorney-client exception in an overbroad manner to conceal entire categories of communications;

c. Failing to explain the basis for withholding records as required by the statute; and

~~d. Declaring Plaintiff's requests "complete" and "closed" while still withholding responsive data.~~

~~77. The City's violations were at least negligent and, on information and belief, were willful.~~

~~78. As a result of these violations, Plaintiff has incurred damages, including time and expense, and has been hindered in his ability to challenge the City's actions.~~

~~79. Under **Minn. Stat. § 13.08**, Plaintiff is entitled to actual damages, costs, disbursements, and, for willful violations, exemplary damages, as well as reasonable attorney's fees should he later obtain counsel.~~

---

~~**VI. PRAYER FOR RELIEF**~~

~~Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:~~

~~a. **Compensatory damages** in an amount to be proven at trial for economic loss, emotional distress, and other injuries caused by Defendants' unlawful actions;~~

126. ~~b. **Exemplary damages** under Minn. Stat. § 13.08 for any willful violations of~~ Plaintiff pleads substantive due process in the alternative to procedural due process.

127. Defendants' conduct was arbitrary, targeted, and conscience-shocking in the land-use context because officials used generalized fear and stigma, compared Plaintiff's proposed organic/no customer/no-solvent home-garage cultivation plan to dangerous trades, failed to provide individualized review, and adopted a categorical exclusion in response to the only known applicant.

128. Plaintiff does not claim that every incorrect zoning decision is a constitutional violation. Plaintiff claims this specific City-controlled sequence was arbitrary and oppressive enough to violate substantive due process if the Court determines the wrong is not fully addressed as procedural due process.

129. Defendants' conduct caused Plaintiff damages.

**COUNT V - Minnesota Government Data Practices Act**

130. Plaintiff incorporates all preceding paragraphs.

131. On April 30, 2025, Plaintiff submitted a public data request seeking City communications and records relating to cannabis, hemp, home-based business, zoning ordinances, and Plaintiff's request. Ex. 0043.

132. On May 7, 2025, Hill responded by producing some materials but withholding attorney communications under Minnesota Statutes Section 13.393 and stating no permit denial existed because Plaintiff had not filed an application for zoning permits. Ex. 0047.

133. On May 9, 2025, Plaintiff challenged and clarified the data response. Ex. 0049.

134. On May 12, 2025, the City produced additional material while stating it would not make a practice of disclosing attorney-client data. Ex. 0050.

135. Plaintiff alleges that the City's initial response was incomplete or improperly broad and that discovery is needed to determine whether all public responsive data was produced and whether any non-attorney public data was improperly withheld or delayed.

136. Plaintiff seeks all remedies allowed by the Minnesota Government Data Practices Act, including damages, costs, declaratory relief, and any other statutory relief available by law.

**c. A declarationPrayer for Relief**

-        Enter judgment declaring that Defendants' actions, as alleged above,Defendants violated Plaintiff'sPlaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and under Minnesota law as pleaded;

d. Plaintiff's **costs and disbursements** in this action, and reasonable attorney's fees should he later retain counsel, pursuant to **42 U.S.C. § 1988** and **Minn. Stat. § 13.08**;

- ~~e. Pre~~ Award compensatory damages to be proven, including damages for lost meaningful process, loss of personal property-use opportunity, loss of first-mover/social-equity opportunity, loss of personal business-launch opportunity, personal economic opportunity, including economic losses tied to Plaintiff's ownership and operation of his single-member LLC, and other damages flowing from Defendants' alleged violations of plaintiffs personal rights, medical and emotional harm, reputational harm, and delay or loss of ability to fund Plaintiff's planned charitable foundation;

- Award nominal damages for constitutional violations even if the amount of compensatory damages is later disputed;

- Award costs and any statutory relief available by law;

- Award pre-judgment and post-judgment interest ~~as~~if allowed by law; ~~and~~

- ~~f. Such other and further~~Grant declaratory relief ~~as~~and any other lawful relief the Court ~~deems~~considers just and ~~equitable.~~proper;

- Plaintiff does not ~~seek injunctive relief~~ request an injunction requiring the City to ~~allow any business~~approve cannabis operations ~~in Waterville or Le Sueur County.~~at

---

~~VII. TRIAL~~

his property or in Waterville.

**Request for Bench Trial**

80.   Plaintiff respectfully requests a bench trial on all issues so triable..

Plaintiff does not demand a jury trial.

Dated: _____, 2025July 21, 2026

Respectfully submitted,

/s/ Travis P.Paul Perry

Plaintiff, pro se

[

Travis Paul Perry

529 N. Mallory Street Address]

[City, State ZIP]

[Telephone]

[

Waterville, MN 56096

Email]: mn.snoeeons@gmail.com

Phone: 507-210-0446

Pro Se Plaintiff